## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **THERESA SANDIFER**, | ) | |
| | ) | |
| Plaintiff, | ) | No. 08 C 1183 |
| | ) | |
| v. | ) | |
| | ) | JUDGE DARRAH |
| **FREEDOM MORTGAGE CORPORATION**, | ) | |
| a New Jersey corporation; **INDYMAC BANK,** | ) | MAGISTRATE JUDGE COLE |
| **F.S.B.**, a federal savings bank; and, **DEUTSCHE** | ) | |
| **BANK NATIONAL TRUST COMPANY**, a | ) | |
| national trust company. | ) | **JURY TRIAL REQUESTED** |
| | ) | |
| Defendants. | ) | |

### AMENDED COMPLAINT FOR VIOLATION OF TRUTH IN LENDING ACT

### Introduction to Nature of Action

1.    Plaintiff files this action seeking a declaration that she has properly elected to rescind her home refinance loan, which was made to her in violation of the federal Truth In Lending Act, 15 U.S.C. §1601, et seq. due to the creditor's failure to properly disclose the finance charges for the loan and its interference with Plaintiff's unconditional right to cancel.

### Jurisdiction and Venue

2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, as the action arises under the laws of the United States.

3.    Venue in this Court is proper pursuant to 28 U.S.C. §1391 as the defendants do business in this District and a substantial part of the events or omissions giving rise to the claim occurred within this District as well as a substantial part of the property involved in this action is located within this District.

### Parties

4.    Plaintiff is the owner and occupant of her home located at 4125 W. Arthington Street in Chicago, Illinois.

5.      **Freedom Mortgage Corporation** ("Freedom") is a New Jersey corporation with its principal place of business located in Mount Laurel, New Jersey.

6.      At all times relevant hereto, Freedom regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments, and is the person to whom the transaction which is the subject of this action is initially payable.  Freedom entered into at least 25 such loans in the year 2003.

7.      **Deutsche Bank National Trust Company** ("Deutsche Bank") is a national trust company with its principal place of business located in Santa Ana, California.  Deutsche Bank presently purports to have an interest in the loan made by Freedom to Plaintiff.

8.      On or about July 18, 2007 Deutsche Bank, as trustee under a pooling and servicing agreement, filed an action in the Circuit Court of Cook County, Chancery Division seeking the equitable remedy of foreclosure against Plaintiff alleging she is delinquent in her obligations under the subject Adjustable Rate Note.  The foreclosure action is still pending as of the date of this pleading.

9.      **IndyMac Bank, F.S.B.** ("IndyMac") is a federal savings bank with its principal place of business located in Pasadena, California.  IndyMac is the parent company or affiliate of Freedom and current claims an interest in the loan made by Freedom to Plaintiff.

## Facts Supporting Claim

10.     On or about November 30, 2004 Plaintiff refinanced the mortgage on her principal residence located at 4125 W. Arthington Street in Chicago, Illinois.  Plaintiff refinanced her mortgage not for the purpose of purchasing the property, but for other personal or family uses.

2

11.     Plaintiff entered into a loan transaction with Freedom to borrow $147,000, which was to be secured with a mortgage lien against her home.  At the time Plaintiff applied for the loan she paid a "NONREFUNDABLE Application Fee" of $350.00.

12.     At the closing of the refinance transaction Plaintiff was presented with the following documents:

a)     HUD – Settlement Statement, attached hereto as Exhibit A;

b)     Federal Truth In Lending Disclosure Statement, attached hereto as Exhibit B;

c)     An interest only Adjustable Rate Note;

d)     Mortgage, a true and correct copy of the executed Mortgage, as generated by the Cook County Recorder of Deeds Office is attached hereto as Exhibit C; and,

e)     Agreement Concerning The Nonrefundability of Advance Fees, attached hereto as Exhibit D.

**<u>Plaintiff's TILA Rights</u>**

13.     Because this transaction was secured by Plaintiff's home and was not entered into for purposes of its initial purchase or construction, the loan was made subject to her rescission rights pursuant to the Truth In Lending Act, 12 U.S.C. §1635, and implementing Federal Reserve Board Regulation Z, 12 C.F.R. §226.

14.     The TILA reads in pertinent part:

**15 U.S.C. §1635(i)(2) – Rescission Rights in Foreclosure**

. . for the purposes of exercising any rescission rights after the initiation of any judicial or nonjudicial foreclosure process on the principal dwelling of the obligor securing an extension of credit, the disclosure of finance charge and other disclosures affected by any finance charge shall be treated as being accurate for purposes of this section if the amount disclosed as the finance charge does not vary from the actual finance charge by more than $35 or is greater than the amount required to be disclosed under this subchapter.

**15 U.S.C. §1635(g) - Additional relief**

In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.

**15 U.S.C. §1640 – Civil Liability**

Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title, or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—

(1) any actual damage sustained by such person as a result of the failure;

(2)(A) (iii) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2,000;

 (3) in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court.

**15 U.S.C. §1641 – Liability of Assignees**

(a) Prerequisites

Except as otherwise specifically provided in this subchapter, any civil action for a violation of this subchapter or proceeding under section 1607 of this title which may be brought against a creditor may be maintained against any assignee of such creditor only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement, except where the assignment was involuntary. For the purpose of this section, a violation apparent on the face of the disclosure statement includes, but is not limited to (1) a disclosure which can be determined to be incomplete or inaccurate from the face of the disclosure statement or other documents assigned, or (2) a disclosure which does not use the terms required to be used by this subchapter.

(c) Right of rescission by consumer unaffected

Any consumer who has the right to rescind a transaction under section 1635 of this title may rescind the transaction as against any assignee of the obligation.

15.    Regulation Z reads in pertinent part:

§226.23

**(a) *Consumer's right to rescind.***

(1)    In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.

(2)    To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is

considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

(3)      The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures, whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act.

**(b)(1)** *Notice of right to rescind.*

In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered by electronic communication as provided in section 226.36(b)). The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

> (i) The retention or acquisition of a security interest in the consumer's principal dwelling.

> (ii) The consumer's right to rescind the transaction.

> (iii) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

> (iv) The effects of rescission, as described in paragraph (d) of this section.

> (v) The date the rescission period expires.

**(d)** *Effects of rescission.*

(1)      When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.

(2)      Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

(3)      If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under paragraph (d)(2) of this section. When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value. At the consumer's option, tender of property may be made at the location of the property or at the consumer's residence. Tender of money must be made at the creditor's designated place of business. If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.

**(h) Special rules for foreclosures.**

 (2) *Tolerance for disclosures.* After the initiation of foreclosure on the consumer's principal dwelling that secures the credit obligation, the finance charge and other disclosures affected by the finance charge (such as the amount financed and the annual percentage rate) shall be considered accurate for purposes of this section if the disclosed finance charge:

(i) is understated by no more than $35; or

(ii) is greater than the amount required to be disclosed.

## Grounds for Rescission

## There Is An Inaccurate Disclosure Of The True Finance Charge Of The Loan

16.     The HUD-1 reveals that Plaintiff was charged $112.50 as the "governmental fee" for the recording of the mortgage, however the proper recording fee was actually no more than $62.50.  On information and belief, no more than $62.50 was actually paid for the recording of the mortgage.

17.     Plaintiff was charged an unreasonable amount of title and settlement fees, including $375.00 for "Settlement of Closing Fee", $150.00 for "Madison Clsng. Coord. Fee", and $195.00 for "Notary Fee."

18.     The total of these amounts are excessive in light of the fact that the closing did not take place at a title company office. Instead, the signing took place at the home of the notary public, despite the fact that the HUD-1 indicates otherwise. As a result, the title company cannot even claim the general operational costs that one could associate with hosting a closing as the event did not take place at the title company's office.

19.     The $195.00 notary fee is particularly excessive considering the Illinois Notary Public Act, 5 ILCS 312/3-104, which states "…the maximum fee in this State is $1 for any notarial act performed." Illinois law does not require the certification of a notary public for a conveyance to be affective.

20.     A Notary Fee is a finance charge that must be disclosed to Plaintiff as a "finance charge" on the Trust In Lending Disclosure Statement pursuant to Regulation Z unless all of the following conditions are met: the document to be notarized is one used to perfect, release, or continue a security interest, the document is required by law to be notarized, the notary is considered a public official, and the amount of the fee is set or authorized by law.

21.     In this case, the notary fee assessed to the Plaintiff is considerably more than the amount authorized by law and the document did not need to be certified by a notary public to be affective.  Therefore, the notary fee does not fall into the narrow exception in TILA and must be disclosed as a finance charge. However, these chargers were not included within the finance charge disclosed to the Plaintiff. Therefore, the disclosed finance charge and APR for the subject loan is inaccurate and a violation of the Plaintiff's TILA rights under section 15 U.S.C. §1635(i)(2).

22.     The amount paid by Plaintiff for the recording of the subject mortgage document and closing fees were not reasonable or bona fide, and to the extent the charge is unreasonable or not bona fide, that amount is properly considered a "finance charge" as that term is defined by the TILA and Regulation Z.

23.     Regulation Z required Freedom to disclose on the Truth In Lending Disclosure Statement the "annual percentage rate" and "finance charge" in connection with the loan to Plaintiff.

24.     Freedom was provided a copy of the HUD-1 showing the amount charged to Plaintiff for the recording of the mortgage, closing, and notary related services prior to its final decision to fund the loan.

25.     Freedom did not disapprove of the charges nor did it alter the Truth In Lending Disclosure Statement to include the actual annual percentage rate or finance charge for the loan, including the above described amounts charged to Plaintiff.

26.     The Federal Truth In Lending Disclosure Statement provided to Plaintiff misrepresented the actual finance charge by at least $619.00.

27.     Pursuant to 15 U.S.C. §1635(i)(2) and 12 C.F.R. §226.23(h)(2), due to the existing foreclosure, the underdisclosure of the finance charge by more than $35 is a violation of the TILA and gives rise to Plaintiff's extended right to rescind the subject transaction.

**The Nonrefundability Agreement Interfered With Plaintiff's Right To Cancel**

28.     The Agreement Concerning The Nonrefundability of Advance Fees reads in pertinent part:

> "Application Fee Refund Policy – The Application Fee shown above is NOT REFUNDABLE even if Freedom Mortgage Corporation (FMC) doing business as Freedom Home Mortgage Corporation in some states rejects my loan application or I withdraw my loan application."

29.     The clear language of the Agreement is that even if plaintiff sought to cancel her request for the loan that she was not entitled to a return of her "NONREFUNDABLE Application Fee."

30.     The application fee charged on the subject loan is a "finance charge" as that term is defined under the TILA and therefore if a consumer seeks to rescind a transaction they are no longer responsible for the application fee.  However, the Agreement contradicts that right by asserting to the consumer they will not be entitled to the return of their "NONREFUNDABLE Application Fee" regardless of their cancellation.

31.     Plaintiff was entitled to a "clear and conspicuous" notice of her right to cancel, which the "Nonrefundability" Agreement interfered with.

32.     The failure to provide Plaintiff with a "clear and conspicuous" notice of her right to cancel gives rise to an extended right to rescind the transaction.

**Assignee Liability for the TILA Violations and Rescission**

33.     Deutsche Bank now purports to be the legal and/or beneficial owner of the subject Adjustable Rate Note and Mortgage.

34.      IndyMac now purports to have the legal right to payments under the Adjustable Rate Note and Mortgage.

35.      On November 13, 2007, prior to this action Plaintiff elected to rescind the subject transaction by notifying Freedom, Deutsche Bank, and Indymac, a copy of Plaintiff's election to rescind the subject transaction is attached hereto as Exhibit E.

36.      By the time of this pleading Freedom had not responded to Plaintiff's election and no defendant agreed to honor Plaintiff's election.

WHEREFORE THERESA SANDIFER respectfully requests that the Court enter judgment in her favor and against FREEDOM MORTGAGE CORPORATION, DEUTSCHE BANK NATIONAL TRUST COMPANY, and INDYMAC BANK, F.S.B. for a judgment, capable of recordation in public records, voiding plaintiffs' mortgage; separate statutory damages against FREEDOM MORTGAGE CORPORATION for the underlying failure to properly disclose the finance charge and interfering with Plaintiff's right to cancel; actual and statutory damages against all defendants for their failure to honor Plaintiff's election to rescind; an order requiring deletion of all adverse credit information relating to the loan; an award of Plaintiff's attorney's fees and costs of this action; and, such other relief as this Court deems just and appropriate.

Respectfully Submitted,

_____
Lloyd Brooks

Lloyd J. Brooks
The Brooks Law Firm
15008 Woodlawn Avenue
Dolton, Illinois 60419
(708) 849-8000 Telephone
(708) 849-8080Facsimile
E-mail: lloyd.brooks@thebrooksfirm.com
*Attorney for Theresa Sandifer*

### **JURY DEMAND**

Plaintiff demands a trial by jury for all of her causes of action.

_Lloyd Brooks_

_____

Lloyd Brooks,
Plaintiff's Attorney

# A. Settlement Statement

**U.S. Department of Housing and Urban Development**

OMB No. 2502-0265 (Page 1)

**B. Type of Loan**

| 1. ☐ FHA   2. ☐ FmHA   3. ☐ Conv Unins | 6. File Number | 7. Loan Number | 8. Mortgage Ins Case Number |
|---|---|---|---|
| 4. ☐ VA   5. ☐ Conv Ins.   6. ☐ Seller Finance | 1373842VT | 54035350 | |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name and Address of Borrower | E. Name, Address, and Tax ID Number of Seller | F. Name and Address of Lender |
|---|---|---|
| OC SANDIFER and THERESA SANDIFER 4125 WEST ARTHINGTON STREET CHICAGO, IL 60624 | Tax ID # | Freedom Mortgage Corporation 1000 Atrium Way, Suite 300 Mt. Laurel, NJ 08054 |

| G. Property Location (Complete address, including legal description, if necessary) | H. Settlement Agent Name, Address and Tax ID Number |
|---|---|
| 4125 WEST ARTHINGTON STREET CHICAGO, IL 60624 | LandAmerica OneStop 600 Clubhouse Drive Pittsburgh, PA 15108  Tax ID: |

| Place of Settlement | I. Settlement Date |
|---|---|
| LandAmerica OneStop 600 Clubhouse Drive Pittsburgh,PA 15108 | 11/30/2004 Fund: 12/6/2004 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower** | | **400. Gross Amount Due to Seller** | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to borrower | $9,652.73 | 403. | |
| 104. Ameriquest Mortgage 0043524966 | $134,471.79 | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City property taxes | | 406. City property taxes | |
| 107. County property taxes | | 407. County property taxes | |
| 108. Assessment Taxes | | 408. Assessment Taxes | |
| 109. School property taxes | | 409. School property taxes | |
| 110. MUD taxes | | 410. MUD taxes | |
| 111. Other taxes | | 411. Other taxes | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 116. | | 416. | |
| **120. Gross Amount Due From Borrower** | $144,124.52 | **420. Gross Amount Due to Seller** | $0.00 |
| **200. Amounts Paid By Or in Behalf Of Borrower** | | **500. Reductions in Amount Due to Seller** | |
| 201. Deposit or earnest money | | 501. Excess Deposit | |
| 202. Principal amount of new loan(s) | $147,000.00 | 502. Settlement Charges to Seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing Loan(s) Taken Subject to | |
| 204. Commitment fee | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City property taxes | | 510. City property taxes | |
| 211. County property taxes | | 511. County property taxes | |
| 212. Assessment Taxes | | 512. Assessment Taxes | |
| 213. School property taxes | | 513. School property taxes | |
| 214. MUD taxes | | 514. MUD taxes | |
| 215. Other taxes | | 515. Other taxes | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | $147,000.00 | **520. Total Reduction Amount Due Seller** | $0.00 |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross Amount due from borrower (line 120) | $144,124.52 | 601. Gross Amount due to seller (line 420) | $0.00 |
| 302. Less amounts paid by/for borrower (line 220) | $147,000.00 | 602. Less reductions in amt. due seller (line 520) | $0.00 |
| **303. Cash To Borrower** | $2,875.48 | **603. Cash  Seller** | $0.00 |

Previous Edition is Obsolete

Printed at 6:29 PM, November 29, 2004 HUD-1 (3/86)

GF: 1373842VT

| L. Settlement Charges | | | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|---|---|
| 700. Total Sales/Broker's Commission based on price | | $0.00 | @% | = $0.00 | | |
| Division of Commission (line 700) as follows: | | | | | | |
| 701. | | to | | | | |
| 702. | | to | | | | |
| 703. Commission Paid at Settlement | | | | | | |
| **800. Items Payable in Connection with Loan** | | | | | | |
| 801. Loan Origination Fee | 2.5% | to | Freedom Mortgage Corporation | | $3,675.00 | |
| 802. Loan Discount | % | to | | | | |
| 803. Appraisal Fee | | to | Freedom Mortgage Corporation | | $350.00 | |
| 804. Credit Report | | to | Freedom Mortgage Corporation | | $36.00 | |
| 805. Lender's Inspection Fee | | to | | | | |
| 806. Mortgage Insurance Application | | to | | | | |
| 807. Assumption Fee | | to | | | | |
| 808. Application Fee | | to | Freedom Mortgage Corporation | POC (X) $350.00 | | |
| 809. Tax Service Fee | | to | Freedom Mortgage Corporation | | $101.00 | |
| 810. Underwriting Fee | | to | Freedom Mortgage Corporation | | $500.00 | |
| 811. Flood L.O.L Coverage | | to | Freedom Mortgage Corporation | | $22.00 | |
| 812. Courier Fee | | to | Freedom Mortgage Corporation | | $22.00 | |
| 813. MERS Registration Fee | | to | Freedom Mortgage Corporation | | $3.95 | |
| 814. Processing Fee | | to | Freedom Mortgage Corporation | | $250.00 | |
| 815. Document Preparation Fee | | to | Freedom Mortgage Corporation | | $250.00 | |
| **900. Items Required by Lender To Be Paid in Advance** | | | | | | |
| 901. Interest from | 12/6/04 to 12/1/04 | @ $26.78 | /day | | ($133.91) | |
| 902. Mortgage Insurance Premium for months | | to | | | | |
| 903. Hazard Insurance Premium for years | | to | | | | |
| 904. Co. Taxes 16-15-417-014-0000 | | to | Cook County Collector | | $1,296.53 | |
| 905. Consumer Debt | | to | CBCS | | $488.00 | |
| 906. Consumer Debt | | to | Inovision | | $351.00 | |
| 907. Consumer Debt | | to | MEDCLR | | $281.00 | |
| 908. Consumer Debt | | to | CAP ONE BANK | | $237.00 | |
| 909. Consumer Debt | | to | COMP CRDT SRV | | $100.00 | |
| 910. Consumer Debt | | to | Dependon Collection Se | | $75.00 | |
| 911. Consumer Debt | | to | HARVARD COLL | | $63.00 | |
| 912. Consumer Debt | | to | People's Energy | | $23.00 | |
| **1000. Reserves Deposited With Lender** | | | | | | |
| 1001. Hazard insurance | | months @ | per month | | | |
| 1002. Mortgage insurance | | months @ | per month | | | |
| 1003. City property taxes | | months @ | per month | | | |
| 1004. County property taxes | | months @ | per month | | | |
| 1005. Assessment Taxes | | months @ | per month | | | |
| 1006. School property taxes | | months @ | per month | | | |
| 1007. MUD taxes | | months @ | per month | | | |
| 1008. Other taxes | | months @ | per month | | | |
| 1011. Aggregate Adjustment | | | | | | |
| **1100. Title Charges** | | | | | | |
| 1101. Settlement or closing fee | | to | LAWYERS TITLE INSURANCE COMPANY | | $375.00 | |
| 1102. Abstract or title search | | to | LAWYERS TITLE INSURANCE COMPANY | | $225.00 | |
| 1103. Title examination | | to | | | | |
| 1104. Title insurance binder | | to | | | | |
| 1105. Document preparation | | to | | | | |
| 1106. Notary fees | | to | | | | |
| 1107. Attorney's fees | | to | | | | |
| (includes above items numbers: | | | ) | | ■■■ | |
| 1108. Title insurance | | to | LAWYERS TITLE INSURANCE COMPANY | | $429.66 | |
| (includes above items numbers: | | | ) | | ■■■ | |
| 1109. Lender's coverage | $147,000.00/$429.66 | | | | | |
| 1110. Owner's coverage | $0.00/$0.00 | | | | | |
| 1111. Escrow fee | | to | | | | |
| 1112. EPL Endorsements | | to | LAWYERS TITLE INSURANCE COMPANY | | $35.00 | |
| 1113. Comprehensive Endorsements | | to | LAWYERS TITLE INSURANCE COMPANY | | | |
| 1114. Adjustable Rate Endorsements | | to | LAWYERS TITLE INSURANCE COMPANY | | $65.00 | |
| **1200. Government Recording and Transfer Charges** | | | | | | |
| 1201. Recording Fees | Deed | ; Mortgage $112.50 | ; Releases | | $112.50 | |
| 1202. City/county tax/stamps | Deed | ; Mortgage | to | | | |
| 1203. State tax/stamps | Deed | ; Mortgage | to | | | |
| 1204. Tax certificates | | to | | | | |
| 1205. State Transfer Fee | | to | | | | |
| 1206. Wire Fee | | to | LAWYERS TITLE INSURANCE COMPANY | | $75.00 | |
| **1300. Additional Settlement Charges** | | | | | | |
| 1301. Survey | | to | | | | |
| 1302. Pest Inspection | | to | | | | |
| 1303. Madison Clsg Coord Fee | | to | Yvette Binn Graham | | $150.00 | |
| 1304. Madison Notary Fee | | to | Madison Credit Management | | $195.00 | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | | | | $9,652.73 | |

GF: 1373842VT

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a completed copy of pages 1, 2 and 3 of this HUD-1 Settlement Statement.

_____

OC SANDIFER

_____

THERESA SANDIFER

### SETTLEMENT AGENT CERTIFICATION

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement.

_____
Settlement Agent                                    Date

**Warning:** It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

**Seller's Taxpayer Identification Number Solicitation and Certification**
You are required by law to provide the Settlement Agent named above with your correct taxpayer identification number. If you do not provide the Settlement Agent with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. **Under Penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.**

_____
Seller's Signature                                    Date

Previous Edition Obsolete                HUD-1 (3/91)

## FEDE  , TRUTH-IN-LENDING DISCLOSURE STAT    ENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Loan Number:  54035350

Date: NOVEMBER 30, 2004

Creditor: FREEDOM MORTGAGE CORPORATION DBA FREEDOM HOME MORTGAGE CORPORATION
Address: 1000 ATRIUM WAY, SUITE 300, MOUNT LAUREL, NEW JERSEY 08054

Borrower(s): O.C. SANDIFER, JR., THERESA L. SANDIFER

Address: 4125 WEST ARTHINGTON ST, CHICAGO, ILLINOIS 60624

Lines containing an "x" are applicable:

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | ☐ Total Sale Price The total cost of your purchase on credit including your down-payment of $ |
|---|---|---|---|---|
| 7.873  % | $  244,321.95 | $  140,889.96 | $  385,211.91 | $ |

PAYMENTS: Your payment schedule will be:

| Number of Payments | Amount of Payment ** | When Payments Are Due | Number of Payments | Amount of Payment ** | When Payments Are Due | Number of Payments | Amount of Payment ** | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| | | Monthly Beginning | | | Monthly Beginning | | | Monthly Beginning |
| 36 | 814.63 | 01/01/05 | | | | | | |
| 24 | 949.38 | 01/01/08 | | | | | | |
| 299 | 1,110.33 | 01/01/10 | | | | | | |
| 1 | 1,111.44 | 12/01/34 | | | | | | |

_____ DEMAND FEATURE:  This obligation has a demand feature.

__X__ VARIABLE RATE FEATURE:  Your loan contains a variable rate feature.  Disclosures about the variable rate feature have been provided to you earlier.

INSURANCE:  The following insurance is required to obtain credit:
  _____ Credit life insurance and credit disability   __X__ Property Insurance   _____ Flood Insurance   _____ Private Mortgage Insurance
  You may obtain property insurance from any insurer that is acceptable to the Lender.

SECURITY:  You are giving a security interest in: 4125 WEST ARTHINGTON STREET, CHICAGO, ILLINOIS 60624
  _____ The goods or property being purchased   __X__ Real property you already own.

FILING FEES: $

LATE CHARGE:  If payment is more than _____ 15 _____ days late, you will be charged _____ 5.000 _____ % of the payment.

PREPAYMENT:  If you pay off early, you
  _____ may   __X__ will not   have to pay a penalty.
  _____ may   __X__ will not   be entitled to a refund of part of the finance charge.

ASSUMPTION:  Someone buying your property
  _____ may   _____ may, subject to conditions   __X__ may not   assume the remainder of your loan on the original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.

__X__ "e" means an estimate   _____ all dates and numerical disclosures except the late payment disclosures are estimates.

Each of the undersigned acknowledge receipt of a complete copy of this disclosure.  The disclosure does not constitute a contract or a commitment to lend.

| Applicant  O.C. SANDIFER, JR. | Date | Applicant  THERESA L. SANDIFER | Date |
|---|---|---|---|
| Applicant  JOAN A. GRISHAM | Date | Applicant | Date |
| Applicant | Date | Applicant | Date |

** NOTE:  Payments shown above do not include reserve deposits for taxes, assessments, and property or flood insurance.

Doc#: 0436521021 Fee: $58.00
Date: 12/30/2004 02:12 PM Pg: 1 of 18
Cook County Recorder of Deeds

This Instrument Prepared By:

After Recording Return To:
~~FREEDOM MORTGAGE CORPORATION~~
~~1000 ATRIUM WAY, SUITE 300~~
~~MOUNT LAUREL, NEW JERSEY 08054~~
~~Loan Number: 54995350~~
US Recordings, Inc.
2925 Country Drive Ste 201
St. Paul, MN 55117
2283 9466

——————— [Space Above This Line For Recording Data] ———————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "**Security Instrument**" means this document, which is dated   NOVEMBER 30, 2004   , together with all Riders to this document.
**(B)** "**Borrower**" is  O.C. SANDIFER, JR. AND THERESA L. SANDIFER AND JOAN A. GRISHAM

Borrower is the mortgagor under this Security Instrument.
**(C)** "**Lender**" is FREEDOM MORTGAGE CORPORATION DBA FREEDOM HOME MORTGAGE CORPORATION
Lender is a A CORPORATION                                                                             organized
and existing under the laws of  NEW JERSEY
Lender's address is 1000 ATRIUM WAY, SUITE 300, MOUNT LAUREL, NEW JERSEY 08054
Lender is the mortgagee under this Security Instrument.
**(D)** "**Note**" means the promissory note signed by Borrower and dated NOVEMBER 30, 2004
The Note states that Borrower owes Lender ONE HUNDRED FORTY-SEVEN THOUSAND AND 00/100                                             Dollars (U.S. $147,000.00           )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than DECEMBER 1, 2034           .
**(E)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."
**(F)** "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(G)** "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Other(s) [specify] |
| ☒ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

DocMagic *eForms* 800-649-1362
www.docmagic.com



(H)    "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I)    "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J)    "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K)    "**Escrow Items**" means those items that are described in Section 3.

(L)    "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M)    "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N)    "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O)    "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P)    "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns the following described property located in the

COUNTY    of    COOK                    :
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".

which currently has the address of    4125 WEST ARTHINGTON STREET

[Street]

CHICAGO                    , Illinois                    60624    ("Property Address"):
[City]                            [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.   **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the

Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument,



Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund

of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

   **6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

   **7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

   Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

   **8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

   **9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

   Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

   If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

   **10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage

Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.



In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.



**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law.  Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property.  Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized

to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

**25. Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_O.C. Sandifer Jr._ (Seal)
O.C. SANDIFER, JR.                    -Borrower

_Theresa L Sandifer_ (Seal)
THERESA L. SANDIFER                    -Borrower

_____ (Seal)
JOAN A. GRISHAM                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

Witness:                                   Witness:

_____           _____

_____           _____

———————————— [Space Below This Line For Acknowledgment] ————————————

State of Illinois
County of  COOK

The foregoing instrument was acknowledged before me this _30th of November 2001_
by O.C. SANDIFER, JR., THERESA L. SANDIFER, JOAN A. GRISHAM

"OFFICIAL SEAL"
Angela C. Walker
Notary Public, State of Illinois
My Commission Exp. 09/26/2008

_Angela C. Walker_
Signature of Person Taking Acknowledgment

_Notary_
Title

(Seal)

Serial Number, if any _____

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)        _____ (Seal)
O.C. SANDIFER, JR.        -Borrower     THERESA L. SANDIFER        -Borrower

_____ (Seal)        _____ (Seal)
JOAN A. GRISHAM           -Borrower                               -Borrower

_____ (Seal)        _____ (Seal)
                          -Borrower                               -Borrower

Witness:                               Witness:

_____               _____

—————————— [Space Below This Line For Acknowledgment] ——————————

State of Illinois
County of COOK

The foregoing instrument was acknowledged before me this November 30, 2004
by O.C. SANDIFER, JR., THERESA L. SANDIFER, JOAN A. GRISHAM

_____
Signature of Person Taking Acknowledgment

_____
Title  Notary Public

_____
Serial Number, if any

(Seal)

Loan Number: 54035350

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 30th day of NOVEMBER, 2004 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to  FREEDOM MORTGAGE CORPORATION DBA FREEDOM HOME MORTGAGE CORPORATION, A CORPORATION
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

4125 WEST ARTHINGTON STREET, CHICAGO, ILLINOIS 60624
[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

---

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I.   CROSS-DEFAULT PROVISION.**   Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.


_____ (Seal)          _____ (Seal)
O.C. SANDIFER, JR.      -Borrower        THERESA L. SANDIFER      -Borrower


_____ (Seal)          _____ (Seal)
JOAN A. GRISHAM         -Borrower                                 -Borrower


_____ (Seal)          _____ (Seal)
                        -Borrower                                 -Borrower


MULTISTATE 1-4 FAMILY RIDER
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3170 1/01                          Page 3 of 3

DocMagic *eForms* 800-649-1362
www.docmagic.com

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)
O.C. SANDIFER, JR.              -Borrower

_____ (Seal)
THERESA L. SANDIFER             -Borrower

_____ (Seal)
JOAN A. GRISHAM                 -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

THE FOLLOWING DESCRIBED REAL PROPERTY SITUATE IN THE CITY OF CHICAGO, COUNTY OF COOK, AND STATE OF ILLINOIS, TO WIT:

LOT 155 IN BUTLER LOWRYS CRAWFORD ADDITION TO CHICAGO IN THE EAST 1/2 OF THE SOUTH EAST 1/4 OF SECTION 15, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

TAX ID #: 16-15-417-014-0000



U22839466-010P18

MORTGAGE
LOAN# 54035950
US Recordings

# FREEDOM MORTGAGE CORPORATION

DATE:                    11/04/04
APPLICANT (S):           OC SANDIFER, THERESA SANDIFER
SUBJECT PROPERTY:        4125 WEST ARTHINGTON ST, CHICAGO IL 60624
LOAN #:                  54035350

## AGREEMENT CONCERNING THE NONREFUNDABILITY OF ADVANCE FEES

This disclosure is provided to you so that you fully understand and agree to the refund ability and NONREFUNDABILITY of fees that you may be required to pay prior to your settlement. The following advance fees are required to be paid by you (except if otherwise prohibited):

Check_____ VISA____ MasterCard_____ AMEX_____ Money Order_____ Other_____

NONREFUNDABLE Application Fee   $ 350.00
Appraisal Fee                   $
Credit Report Fee               $
Lock-In Fee                     $
Other: _____         $ _____

Total Advance Fees to be Paid   $ 350

### APPLICATION FEE REFUND POLICY

The Application Fee shown above is NOT REFUNDABLE even if Freedom Mortgage Corporation (FMC) doing business as Freedom Home Mortgage Corporation in some states rejects my loan application or I withdraw my loan application.

### INTEREST RATE LOCK-IN FEE REFUND POLICY

As stated in your "Rate Option & Lock-in Agreement", your Interest Rate Lock-in Fee is NONREFUNDABLE, except under the following circumstances:

   1) If FMC issues a commitment to make you a loan and commitment is conditioned on the approval of a third-party investor or mortgage insurance company and that party rejects the loan.

   2) If the property appraisal report is not favorable for the loan in which you applied (unless you and FMC agree on another loan for which the appraisal is favorable).

   3) If you provided FMC with complete and accurate credit information and your application is declined.

*New Jersey Residents: You may have the option of canceling your application and receiving a refund of your lock-in-fee if your loan does not close prior to the expiration date of the lock-in through no substantial fault of your own.*

Your Interest Rate Lock-in Fee WILL NOT be either refunded OR credited against the total fees at closing AND your Rate Option & Lock-in Agreement will be VOID if:

   1) You withdraw your loan application.

   2) You or your agent fail to promptly provide all necessary information and documentation in form and manner satisfactory to FMC, or otherwise cooperate in the processing of your application.

   3) You or your agent provide any materially inaccurate information, or omit any material information, whether in your application or otherwise in the processing of your application. Information is "materially inaccurate" if the correct information would, in the sole discretion of FMC, cause you to be disqualified for the type of loan for which you have applied, or cause the secondary market source, if any, for which the loan is being originated to refuse to purchase the loan; OR

   4) If you have paid your interest rate Lock-in fee by credit card or by check, and the charge or check is refused for payment.

### APPRAISAL FEE & CREDIT REPORT FEE

If your loan closes, the amount paid for these fees will be credited against the actual cost incurred by FMC. If the fees you have paid are greater than the actual cost, the excess money will be credited towards other fees. If the fees you have paid are less than the actual cost, you will be required to pay additional money at closing to cover the actual cost. If your loan does not close, these fees will be refunded only if FMC has not incurred the cost associated with these fees.

This disclosure is not an approval of your loan application or a commitment to make a loan. FMC cannot guarantee approval of the loan application or acceptance into a particular program.

FMC cannot guarantee approval of the loan application or acceptance into particular program.

_____        _Theresa L Sandifer_ 11/30/04
Applicant                Date             Applicant            Date

_____
Lender Representative
Amy King                                              Date

107NRFND ~11/02

# THE BROOKS LAW FIRM

### 1 5 0 0 8   W o o d l a w n   A v e n u e
### F l o o r   O n e
### D o l t o n ,   I l l i n o i s   6 0 4 1 9

## Lloyd J. Brooks, CPCU
**Attorney at Law**

**(708) 841-8000 Telephone**
**(708) 841-8080 Facsimile**
**lloyd.brooks@thebrooksfirm.com**
**www.thebrooksfirm.com**

November 13, 2007

**VIA CERTIFIED MAIL**
*7006 2150 0002 1451 3465*
Freedom Mortgage Corporation
1000 Atrium Way, Suite 300
Mount Laurel, New Jersey 08054

**VIA CERTIFIED MAIL**
*7006 2150 0002 1451 3472*
Deutsche Bank National Trust Company
1761 East Saint Andrew Place
Santa Ana, California 92705

**VIA CERTIFIED MAIL**
*7006 2150 0002 1451 3489*
Indymac Bank, F.S.B.
P.O. Box 4045
Kalamazoo, Michigan 49003-4045

**VIA U.S. FIRST CLASS MAIL**
Deutsche Bank National Trust Company
c/o Codilis & Associates, P.C.
15W030 North Frontage Road, Suite 100
Burr Ridge, Illinois 60527

> Re:   Notice of Rescission and Lien
> O.C. Sandifer, Jr., Theresa Sandifer, and Joan Grisham
> 4125 W. Arthington Street, Chicago, Illinois 60624
> Freedom Mortgage Corp. Loan No.: 54035350
> Indymac Bank Loan No.: 1005117393
> *Deutsche Bank National Trust Co. v. O.C. Sandifer, et al.,* 07 CH 18916

To The Interested Parties Addressed Above:

Please be advised that this office has been retained by the above clients to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

You are further notified that my clients elect to cancel the loan of November 30, 2004 for failure to comply with the Truth in Lending Act and its implementing regulations, Regulation Z. Pursuant to 15 U.S.C. §1641, demand is made for the identity of the owner of this note and mortgage. Pursuant to 12 U.S.C. §2605, I request an account history, so that I may determine what, if anything, my clients are obligated to repay.

My clients' election to rescind the subject transaction is based upon several violations of the Truth In Lending Act including:

(1) The unreasonable amount of title and settlement fees charged my clients, including $375.00 for "Settlement or Closing Fee", $150.00 for "Madison Clsng. Coord. Fee", and $195.00 for "Notary Fee". The total of these amounts is excessive in light of the fact that the closing did not take place at a title company office, but instead at the home of a notary public. The excessive amount of these charges were not included within the finance charge disclosed to my clients,

Notice of Rescission and Lien
O.C. Sandifer, Jr., Theresa Sandifer, and Joan Grisham
4125 W. Arthington Street, Chicago, Illinois 60624
Freedom Mortgage Corp. Loan No.: 54035350
Indymac Bank Loan No.: 1005117393
*Deutsche Bank National Trust Co. v. O.C. Sandifer, et al.*, 07 CH 18916
November 12, 2007
Page 2

making the disclosed finance charge and APR for the loan inaccurate in violation of my clients' TILA rights. See 15 U.S.C. §1635(i)(2).

(2) The unreasonable recording fees charged to my clients for the recording of the lender's mortgage lien in the amount of $112.50. I reviewed the mortgage and its attachments finding it to be a total of 15 pages. According to state law the recording of the mortgage totaled no more than $62.50. The excessive amount of this charge was not included within the finance charge disclosed to my clients, making the disclosed finance charge and APR for the loan inaccurate in violation of my clients' TILA rights. See 15 U.S.C. §1635(i)(2).

(3) All three of my clients have an ownership interest in the subject property, however the TILA required Notice of Right to Cancel was only addressed to O.C. Sandifer and Theresa Sandifer in violation of Joan Grisham's right to rescind.

(4) Freedom Mortgage Corp. charged my clients a "nonrefundable" application fee in the amount of $350.00. The "nonrefundable" fee violates my clients' clear right to rescind the subject transaction, including the right to a refund of the application fee.

Additionally, there is a foreclosure action presently pending in the Circuit Court of Cook County, Illinois filed by Deutsche Bank National Trust Company against my clients in connection with their home. In light of my clients' election to rescind the subject transaction, demand is hereby made pursuant to 15 U.S.C. §1635 that the foreclosure action be dismissed and a release of the mortgage be provided to my clients. Please send all correspondence regarding the rescission of my clients' loan to the undersigned.

Faithfully yours,

THE BROOKS LAW FIRM

Lloyd J. Brooks

CC:    Clients

Notice of Rescission and Lien
O.C. Sandifer, Jr., Theresa Sandifer, and Joan Grisham
4125 W. Arthington Street, Chicago, Illinois 60624
Freedom Mortgage Corp. Loan No.: 54035350
Indymac Bank Loan No.: 1005117393
*Deutsche Bank National Trust Co. v. O.C. Sandifer, et al.*, 07 CH 18916
November 12, 2007
Page 3


     I, Lloyd Brooks, under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the addresses for each entity addressed above via U.S. mails as indicated above each addressee on November 12, 2007.


_____
Lloyd Brooks